UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| G.C., By and Through Her Parent and Legal Guardian, A.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-cv-04128-SLD-JEH |
| | ) | |
| ROCK ISLAND-MILAN SCHOOL DISTRICT NO. 41, and ROCK ISLAND BOARD OF EDUCATION, | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

Plaintiff G.C., by and through her parent and legal guardian, A.C., has sued Defendants Rock Island-Milan School District No. 41 ("the District") and Rock Island Board of Education ("the Board"), alleging that they are responsible for unknown students sexually assaulting G.C. *See generally* First Am. Compl., ECF No. 7.  Pending before the Court is the Board's Motion to Dismiss Plaintiff's Amended Complaint, ECF No. 8.  For the reasons that follow, the motion to dismiss is GRANTED IN PART and DENIED IN PART.

**BACKGROUND[1]**

G.C. was a minor female diagnosed with autism spectrum disorder and hearing loss when she began her freshman year as a new student at Rock Island High School ("School").  Autism impairs social interaction and communication and impacts behavior.  The School is part of the District, which is in turn governed and operated by the Board.  The District participated in and produced an individualized education program ("IEP") for G.C., and which stated that G.C. had

---

[1] At the motion to dismiss stage, the court "accept[s] as true all well-pleaded facts in the complaint, and draw[s] all reasonable inferences in [the nonmovant]'s favor."  *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016).  Unless otherwise noted, the alleged factual background is drawn from G.C.'s First Amended Complaint.

special needs due to her intellectual and physical disabilities.  G.C. asserts that the IEP should have given the District notice that she: (1) required a high level of special education support; (2) needed specialized instruction and accommodations to help her navigate the daily aspects of friendships and other school relationships; (3) struggled to discern friend from foe; and (4) would be highly susceptible to injury if left alone and unsupervised.

On August 8, 2022, G.C. was attending a gym class outdoors which was supervised by Benjamin Hammer.  G.C. injured her ankle and was temporarily unable to move from her location near the tennis courts on School property.  G.C.'s requests for help were disregarded and she was left alone, injured, and unsupervised.  She was then sexually assaulted by one or more School students.  Later that day, A.C. noticed an unusual smell coming from G.C.'s private areas.  The next day, G.C. told A.C. about the assault, and A.C. went to the School to report that G.C. had been assaulted.  A School employee told A.C. that no one was available to receive that report and told A.C. to return later.  A.C. came back again that day and met with School staff members Tina Eygaboard and Lorelei Andedo to report the assault.  "A.C. was told that G.C. would have been with Hammer the entire time so the assault 'couldn't have happened.'"  *Id.* ¶ 42.  Andedo viewed G.C.'s IEP on a laptop and stated that "G.C. received social skills classes so she 'just probably needed social skills classes to learn what "no spots" are and how to tell people no.'"  *Id.* ¶ 43.  Andedo and Eyhaboard concluded that G.C. was probably not sexually assaulted and that the smell was likely due to the heat outside.

A.C.'s request that the District notify the police so the incident could be investigated was denied—A.C. was told that the District only notifies the police if the school liaison officer determined it necessary.  That evening, Andedo called A.C. and stated that she had spoken with a few students, who reported that they had not seen G.C. sitting near the tennis courts.  She also

stated that the school's security cameras did not cover the area where the assault had occurred, which impeded the School's ability to better help G.C.  She also stated that Hammer and some students had confirmed that G.C. asked for help, yet no action was taken to help G.C. or assess her circumstances.  She asserted that the District was not denying that "something happened" to G.C., but described the situation as a "minor error."  *Id.* ¶¶ 49–50.  She offered at-home counseling services and to switch G.C.'s gym class so she would have a female instructor.

Two days later, on August 11, 2022, A.C. reported the assault to the Rock Island Police Department.  A.C. was informed by a detective the next day that he was unaware if the high school had reported the assault to them.  On or about August 16, 2022, A.C. contacted the School and requested to collect G.C.'s belongings from the School.  A few days later, A.C. was informed that the District had "reported an incident of failed supervision" to the Illinois Department of Children and Family Services on August 16, 2022.  *Id.* ¶ 55.  Between August 26, 2022 and August 31, 2022, A.C. continued to speak with the District's representatives.  The District's "only concern" was whether A.C. would bring G.C. back to the School, citing the obligation imposed upon the School by the IEP to provide an education for G.C.  *Id.* ¶ 58.  A.C. stated that she did not trust the School to adequately protect G.C. and requested that she be transferred to the alternative school in East Moline at Black Hawk Special Education Center.  A.C. was told that such a transfer was not recommended because the School had the resources available to accommodate G.C.'s needs.  On August 30, 2022, A.C. filed a complaint in person at the District's Human Resources Office.  "In response to the complaint, former Superintendent Reginald Lawrence told A.C. 'we weren't going to go there' and that A.C. 'needed to understand [her] legal obligation to educate [her] child.'"  *Id.* ¶ 68 (alterations in original).

On or about September 20, 2022, A.C. met with Alicia Sanders and Jenny Fuhr at the District's superintendent's office.  A.C. asked about the protocols and policies that District employees were expected to follow when a student provides a credible report of sexual assault and asked for a copy of those policies.  The District maintained a Title IX policy which (1) allowed individuals to report incidents to the Title IX coordinator, or "any employee with whom the person is comfortable speaking"; (2) required the District to investigate reports of sexual assault and maintain an educational program free of harassment; (3) mandated making and forwarding reports of sexual harassment to the Title IX Coordinator; and (4) required an objective evaluation of all relevant evidence after receiving a report. *Id.* ¶¶ 90–94.  Sanders told A.C. that District staff members were trained and expected to notify the police and student services at the superintendent's office of such a report.  She also stated that District staff members were obligated to engage the student's IEP team about the report. These steps were not followed after A.C. reported G.C.'s assault and A.C. never received the policies or any other documentation.

A.C. also asked about how other similar reports were handled in the District.  She was told that: (1) there had been five or six other cases involving sexual assault;[2] (2) the policies were followed in the other cases; and (3) G.C.'s case was the only time the policies were not followed.  G.C. alleges upon information and belief that her case was the only one which involved a student with special needs and/or disabilities.  G.C. suffered mental anguish and attended therapy to help her cope with the stress and anxiety she felt due to these events, manifesting as difficulty sleeping and focusing, panic attacks, flashbacks of the assault, and feeling unsafe.  G.C. was unable to attend her scheduled classes, fell behind in her schoolwork,

---

[2] G.C.'s First Amended Complaint does not specify when these reports were made—for example, whether there were five or six reports in just the previous school year, or some longer period of time.

and ultimately withdrew from the School.  As of the First Amended Complaint's filing, G.C. is home-schooled.

G.C.'s complaint was filed on August 7, 2023, Compl., ECF No. 1, and amended on August 28, 2024, First Am. Compl.  G.C.'s First Amended Complaint asserts four counts: (I) deliberate indifference in violation of Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. §§ 1681–1689, *id.* ¶¶ 102–21; (II) violation of Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, *id.* ¶¶ 122–39; (III) violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12165, *id.* ¶¶ 140–46; and (IV) negligence, *id.* ¶¶ 147–54.  The Board moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss the First Amended Complaint with prejudice.  Mot. Dismiss 1; Mem. Supp. Mot. Dismiss 15, ECF No. 9.  G.C. requests that the Court either deny that motion or give her leave to file another amended complaint.  Resp. Mot. Dismiss 29, ECF No. 12.

## DISCUSSION

### I.  Legal Standard

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  At the motion to dismiss stage, the key inquiry is whether the complaint is "sufficient to provide the defendant with 'fair notice' of the plaintiff's claim and its basis."  *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).  While "detailed factual allegations are unnecessary, the complaint must have 'enough facts to state a claim to relief that is plausible on its face.'"  *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[M]ere 'labels and conclusions or a formulaic recitation of the elements of a cause of action'" are not sufficient to satisfy the plausibility standard. *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678). A court must take "[t]he complaint's well-pleaded factual allegations, though not its legal conclusions, . . . [as] true," *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019 (7th Cir. 2013), and "draw all inferences in the light most favorable to the nonmoving party," *Vesely v. Armslist LLC*, 762 F.3d 661, 664 (7th Cir. 2014).

## II.    Analysis

### A.    Proper Defendants

Before turning to the Board's arguments that the First Amended Complaint fails to state a plausible claim for relief, the Court addresses the Board's assertion in a footnote that it "is the only legal entity capable of being sued." Mem. Supp. Mot. Dismiss 1 n.1 (first citing 105 ILCS 5/10-2, and then citing *Bd. of Educ. of Bremen High Sch. Dist. No. 228 v. Mitchell*, 899 N.E.2d 1160, 1165–66 (Ill. App. Ct. 2008)). The cited statute establishes that a board of education is "a body politic and corporate" which "may sue and be sued," 105 ILCS 5/10-2, and the cited case notes that "a school district lacks the capacity to sue in its own behalf unless specifically authorized to do so in the context of a companion statute," *Mitchell*, 899 N.E.2d at 1166. These sources say nothing about whether a school district may be sued—as compared to filing a suit itself—and the answer is not as straightforward as the Board's cursory treatment of this question implies. *See Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 640 (7th Cir. 2015) (noting the "unexamined assumptions of prior cases" which involved adjudicating "many special-education suits brought by and against school districts in Illinois"); *Smoler v. Bd. of Educ. for W. Northfield Sch. Dist. #31*, 524 F. Supp. 3d 794, 802 (N.D. Ill. 2021) ("To be clear,

Illinois law does not say that a school district categorically lacks the capacity to sue or be sued; again, a school district can sue or be sued if a statute expressly permits it."). G.C. does not respond to the Board's footnote. The Court declines the Board's implicit request to dismiss the District as an improper Defendant in this case, but may revisit this issue should the parties adequately address it in the future. Some clarification of nomenclature, however, is warranted. The First Amended Complaint refers to the District and the Board collectively as "the District," First. Am. Compl. 1; in its motion to dismiss, the Board seems to refer to itself as "the District," *e.g.*, Mem. Supp. Mot. Dismiss 3, and G.C.'s response to the motion refers to "Defendant," *e.g.*, Resp. Mot. Dismiss 1. For purposes of this order, the Court uses the Board to refer to the movant, Rock Island Board of Education, and Defendants to collectively refer to the allegedly liable actors, the Board and the District.[3]

### B.  Merits

The Board begins by arguing that G.C.'s negligence claim is either barred by state tort immunity statutes or fails due to insufficient allegations that Defendants owed her a duty. Mem. Supp. Mot. Dismiss 2–9. The Board then asserts that G.C. either fails to allege a necessary element for her Title IX claim, mistreatment on the basis of sex, *id.* at 9–11, or fails to allege that Defendants were deliberately indifferent to the risk that G.C. would be harmed, *id.* at 11–13. The Board concludes by advancing one set of arguments against both the ADA and Rehabilitation Act claims, namely that her allegations do not state a claim under any disability-discrimination theories. *Id.* at 13–15.

---

[3] Should both the District and Board remain proper Defendants in this case, the Court recommends that future filings specify which party is allegedly responsible for any act or omission.

### 1. Negligence

G.C. invokes the Court's supplemental jurisdiction to advance her negligence claim. *See* First Am. Compl. ¶ 14 (citing 28 U.S.C. § 1367). The parties assume that Illinois law applies to her claim—in the absence of any choice-of-law dispute, the Court applies the law of Illinois to her claim. *See, e.g.*, *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) ("When no party raises [a] choice of law issue, the federal court may simply apply the forum state's substantive law."). The Board reads the First Amended Complaint to allege four different theories of negligence: (1) failure to properly supervise; (2) failure to properly investigate; (3) failure to discipline Hammer; and (4) failure to discipline the unknown students. Mem. Supp. Mot. Dismiss 2, 5 n.3. Under any of these theories, the Board asserts that Defendants are immune. *Id.* at 2–3. G.C. clarifies that her "negligence claim is based on Defendant's negligent conduct before she was assaulted, not Defendant's subsequent decisions or investigations into the assault." Resp. Mot. Dismiss 13 (citing First Am. Compl. ¶ 151). Therefore, the Court only considers arguments related to G.C.'s claim of improper supervision.

The Board advances two sets of related arguments against this claim. First, it argues that the First Amended Complaint's allegations do not make out the basic elements of a negligence claim, namely duty, breach, causation, and damages, because G.C. does not sufficiently allege that Defendants owed her a duty. Mem. Supp. Mot. Dismiss 7–9. Second, it argues that Defendants are immune under specific provisions of the Local Governmental & Governmental Employees Tort Immunity Act ("Tort Immunity Act") because the First Amended Complaint does not allege that Defendants engaged in willful and wanton conduct. *Id.* at 5–9. A plaintiff alleging that a defendant is not immune because it acted willfully and wantonly must also allege that the defendant owed her a duty, *see, e.g.*, *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of*

*Dirs.*, 973 N.E.2d 880, 887 (Ill. 2012), so the Court takes up the arguments related to Defendants' duty to G.C. before turning to the issue of willful and wanton conduct.

### a.  Duty

The parties dispute whether Defendants owed G.C. a duty, Mem. Supp. Mot. Dismiss 7–9; Resp. Mot. Dismiss 15–18.  "Whether a duty exists is a question of law for the court to decide."  *Jane Doe-3*, 973 N.E.2d at 887.  A court must decide "whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff," *id.* at 888 (quoting *Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1057 (Ill. 2006)), where that relationship "is a shorthand description for the analysis of four factors: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing the burden on the defendant," *id.*  "In order to satisfy the foreseeability component, it is not necessary that a defendant must have foreseen the precise nature of the harm or the exact manner of occurrence; it is sufficient if, at the time of the defendant's action or inaction, some harm could have been reasonably foreseen."  *Regions Bank v. Joyce Meyer Ministries, Inc.*, 15 N.E.3d 545, 552 (Ill. App. Ct. 2014).

The Board argues that it did not owe G.C. a duty because "school boards owe no specific duty to protect students from criminal attacks by others."  Mem. Supp. Mot. Dismiss 7 (citing *J.O. v. Alton Cmty. Unit Sch. Dist. 11*, 909 F.2d 267, 272 (7th Cir. 1990) (rejecting a constitutional claim under 42 U.S.C. § 1983 against a school board premised upon the argument that "the school defendants had a 'special relationship' to the schoolchildren, imposing an affirmative duty to provide for their safety and to prevent the child abuse that occurred [by an employee]")).  G.C. responds by citing many potential duties, such as the duty to supervise and

maintain discipline within schools, the duty to protect against a particular threat where the defendant has unique knowledge of such a threat, the ordinary duty of care owed by every person to all others, and the duty imposed upon a voluntary undertaking.  Resp. Mot. Dismiss 15–16.

G.C.'s arguments regarding the duty to supervise and maintain discipline within schools are sufficient to demonstrate the plausibility of her allegations.  Section 24-24 of the Illinois School Code codifies the doctrine of *in loco parentis*, stating that "[i]n all matters relating to the discipline in and conduct of the schools and the school children," certain employees like teachers "stand in the relation of parents and guardians to the pupils."  105 ILCS 5/24-24; *see also Gammon v. Edwardsville Cmty. Unit Sch. Dist. No. 7*, 403 N.E.2d 43, 45 (Ill. App. Ct. 1980). Where the defendant school district knew that students were playing a violent game which involved striking each other in school bathrooms, a court found that the defendant "owed a duty to supervise the students as part of an overall duty to maintain discipline."  *Brooks v. McLean Cnty. Unit Dist. No. 5*, 8 N.E.3d 1203, 1210 (Ill. App. Ct. 2014).  Here, G.C. alleges that Defendants knew that she was a student with special needs.  First Am. Compl. ¶ 26.  She also alleges that this assault occurred "during school hours and outside on school property," during a gym class and after she had already injured her ankle.  *Id.* ¶¶ 4, 32–34.  Further, she alleges that she was sexually assaulted by other students at the School, not random third parties unaffiliated with the School.  *See id.* ¶ 4.  G.C. need not allege that it was reasonably foreseeable that she would be sexually assaulted by other students to allege a duty sufficient for a claim of ordinary negligence—only that it was reasonably foreseeable that she could be further injured if left alone and unsupervised after injuring her ankle.  *See Regions Bank*, 15 N.E.3d at 552.

Viewing the facts in G.C.'s favor, her allegations that Defendants knew that she had special needs and had injured her ankle are sufficient at this stage of the case to plausibly allege

that it was reasonably foreseeable that she would be further harmed if left unsupervised while injured.  The other factors in the duty analysis also favor the imposition of a duty here, despite the lack of factual allegations establishing any significant likelihood of a sexual assault perpetrated by unknown students.  If a school's duty to maintain discipline extends to preventing violent behavior within that school's bathrooms, it is not more burdensome to extend that same duty to an outdoor gym class, where the students are more visible than when they are behind closed bathroom doors.  *See Brooks*, 8 N.E.3d at 1210.  G.C.'s allegations plausibly implicate Defendants' duty to maintain discipline within schools.

### b.  Immunity

Next, the Board asserts that it is immune from G.C.'s negligence claim.  Mem. Supp. Mot. Dismiss 5–9.  Although the immunity statutes cited by the Board are affirmative defenses, a court "may dismiss a claim based on an affirmative defense where the plaintiff has pleaded herself out of court."  *Love v. City of Chicago*, 363 F. Supp. 3d 867, 872 (N.D. Ill. 2019) (citing *Van Meter v. Darien Park Dist.*, 799 N.E.2d 273, 284 (Ill. 2003)).  The Board invokes a few different immunity statutes, but the Court focuses only upon the arguments raised under section 3-108 of the Tort Immunity Act.  *See* Mem. Supp. Mot. Dismiss 5–6.  Section 3-108 provides that, excepting other contrary statutes, "neither a local public entity nor a public employee who undertakes to supervise an activity on or the use of any public property is liable for an injury unless the local public entity or public employee is guilty of willful and wanton conduct in its supervision proximately causing such injury."  745 ILCS 10/3-108(a).  Therefore, G.C. must sufficiently allege that Hammer's failed supervision constituted willful and wanton misconduct attributable to Defendants to overcome immunity under section 3-108.[4]

---

[4] Like the Board's arguments under section 3-108 of the Tort Immunity Act, its arguments under section 24-24 of the Illinois School Code turn on whether G.C. has plausibly alleged that Defendants engaged in willful and wanton

The Tort Immunity Act defines "[w]illful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210; *see also Doe ex rel. Ortega-Piron v. Chi. Bd. of Educ.*, 820 N.E.2d 418, 423 (Ill. 2004). Willful and wanton conduct is more than "mere inadvertence, incompetence, unskillfulness, or a failure to take precautions." *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 593 N.E.2d 522, 531 (Ill. 1992) (quoting Restatement (Second) of Torts § 500 cmt. g (1965)). But it is not a "separate and independent tort"—instead, it is a "hybrid" of negligent and intentionally tortious acts, and whether the defendant's conduct satisfies this standard significantly depends upon the circumstances of a given case. *Ziarko v. Soo Line R. Co.*, 641 N.E.2d 402, 406 (Ill. 1994); *see also W. Bend Mut. Ins. Co. v. Cmty. Unit Sch. Dist. 300*, 193 N.E.3d 266, 277–78 (Ill. App. Ct. 2021) (describing the "two varieties of willful and wanton conduct, intentional and reckless" (quotation marks omitted)).

Here, the Board first asserts that the First Amended Complaint only alleges mere negligence and does not allege willful and wanton conduct. *See* Mem. Supp. Mot. Dismiss 6–7 ("[T]he Plaintiff does not allege willful and wanton misconduct occurred."). To the extent that the Board is arguing that failure to use the words "willful and wanton" dooms Plaintiff's claims,

---

conduct. *See* Mem. Supp. Mot. Dismiss 7; *Henrich v. Libertyville High Sch.*, 712 N.E.2d 298, 302–03 (Ill. 1998) (holding that defendants were immune from liability for "ordinary negligence" but not for "willful and wanton misconduct"), *as modified on denial of reh'g* (June 1, 1999). Resolution of the parties' dispute under section 3-108 sufficiently resolves the similar dispute implicated by immunity under section 24-24. The parties also dispute whether Defendants are entitled to immunity under 745 ILCS 10/2-201. *See* Mem. Supp. Mot. Dismiss 3–5; Resp. Mot. Dismiss 9–11. Section 2-201 provides that "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201. Immunity under this section "requires the act or omission to be both a determination of policy and an exercise of discretion." *Harrison v. Hardin Cnty. Cmty. Unit Sch. Dist. No. 1*, 758 N.E.2d 848, 852 (Ill. 2001). Here, there are no allegations regarding why Hammer made any decisions, such that it is not clear from the face of G.C.'s complaint that Defendants are entitled to immunity under section 2-201 because Hammer made an unspecified discretionary choice. *See Love*, 363 F. Supp. 3d at 873; *Doe ex rel. Doe v. White*, 627 F. Supp. 2d 905, 923 (C.D. Ill. 2009).

it is mistaken.  The First Amended Complaint alleges that the Board's "acts and omissions were done with malice and/or with reckless indifference to G.C.'s rights," First Am. Compl. ¶ 152, and that it "acted in a grossly negligent and recklessly dangerous manner in failing to properly supervise," *id.* ¶ 154.  G.C. need not incant the right magic words—all that matters is whether the First Amended complaint plausibly alleges willful and wanton misconduct.  *See Ziarko*, 641 N.E.2d at 406 ("Our case law has sometimes used interchangeably the terms 'willful and wanton negligence,' 'gross negligence,' and 'willful and wanton conduct.'").  G.C.'s allegations are that Defendants acted with a mental state more culpable than mere negligence, and the Board is not entitled to dismissal of this claim simply because the First Amended Complaint does not use the phrase "willful and wanton."

The Board more squarely addresses whether G.C.'s allegations rise to the level of willful and wanton conduct when it argues that G.C. fails to allege that Defendants "had knowledge of abuse or impending abuse."  Mem. Supp. Mot. Dismiss 8–9.  "[A] teacher's mere act of leaving children unsupervised will not be sufficient to establish willful and wanton misconduct," as "a plaintiff must show that the teacher or school was aware or should have known that the absence of supervision posed a high probability of serious harm or an unreasonable risk of harm." *Jackson v. Chi. Bd. of Educ.*, 549 N.E.2d 829, 833 (Ill. App. Ct. 1989); *see also Albers ex rel. Albers v. Cmty. Consol. No. 204 Sch.*, 508 N.E.2d 1252, 1255 (Ill. App. Ct. 1987) ("A teacher cannot supervise each and every child at all times while in school or while engaged in a school-related activity.").  For example, although both the victim and perpetrator in *Jackson* were children attending an "educably mentally handicapped (EMH) classroom," 549 N.E.2d at 830, summary judgment was appropriately granted on the basis that the defendant school board was immune from liability because the plaintiff failed to present evidence that "this particular EMH

13

class contained children with behavioral problems or that EMH students by their nature have behavioral disorders," *id.* at 834.

Where Illinois courts have refused to dismiss a claim of willful and wanton misconduct based upon improper supervision, "it has been because plaintiffs have alleged that defendants knew or should have known of a specific, foreseeable, and probable danger arising from their lack of supervision." *See Choice v. YMCA of McHenry Cnty.*, 976 N.E.2d 584, 606–09 (Ill. App. Ct. 2012); *cf. Floyd ex rel. Floyd v. Rockford Park Dist.*, 823 N.E.2d 1004, 1011–12 (Ill. App. Ct. 2005) (finding that allegations about the perpetrator's "general bad behavior" were insufficient where the plaintiff failed to allege that the defendants were aware that the perpetrator "was *physically* violent to others" before he struck the victim with a metal golf club); *Knapp v. Hill*, 657 N.E.2d 1068, 1073–74 (Ill. App. Ct. 1995) (finding that allegations were insufficient because the plaintiff's allegations that defendants were aware of previous injuries in school's auto shop class were "a mere conclusion premised upon unfounded speculation" in the absence of details—what, when, how—regarding those injuries).

Sufficient allegations of such a specific, foreseeable, and probable danger may rely upon the alleged tortfeasor's knowledge of the perpetrator's prior and similar misconduct. For example, in *Ortega-Piron*, the plaintiff's ward was allegedly sexually assaulted by another student on a bus which was unsupervised because the attendant employed by the board had called in sick that day. 820 N.E.2d at 419–20. The Illinois Supreme Court affirmed that the complaint's factual allegations were "sufficient to present jury questions as to the knowledge of the [b]oard and the foreseeability of harm to the plaintiff's ward and, thus, the issue of willful and wanton conduct," where the plaintiff alleged that his ward was disabled, that the perpetrator "had been declared a sexually aggressive child and was under a protective plan requiring that he

14

never be left unsupervised among other children," and that "the [b]oard knew or should have known that no [bus] attendant was present" when the plaintiff's ward was assaulted. *Id.* at 420, 423–24; *see also Doe v. Sch. Dist. U-46*, 557 F. Supp. 3d 860, 878–79 (N.D. Ill. 2021) (finding that a complaint adequately alleged willful and wanton conduct where the plaintiffs had previously complained to the defendants multiple times that their child was being harassed and bullied by other specifically identified students); *Doe v. Dimovski*, 783 N.E.2d 193, 200 (Ill. App. Ct. 2003) (finding that a complaint adequately alleged willful and wanton conduct where the board "fail[ed] to do anything upon learning the sexual transgressions of a teacher with a student").[5]

Yet knowledge of prior incidents is not a requirement, as recklessness may be sufficient to support allegations of willful and wanton conduct. *See Barr v. Cunningham*, 89 N.E.3d 315, 320 (Ill. 2017) (articulating the standard for willful and wanton conduct as a "conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with *knowledge of facts which would disclose this danger to any reasonable man*" (emphasis added) (quotation marks omitted)).  For example, a court found that a complaint sufficiently alleged willful and wanton misconduct—despite the absence of knowledge of prior sexual misconduct by special education classroom assistants generally or a particular assistant specifically—because the complaint's other allegations supported "a plausible inference that the [b]oard knew that its employees were not consistently trained on sexual misconduct policies, knew these policies were

---

[5] To support its argument that "Plaintiff has failed to sufficiently allege that the District had knowledge of abuse or impending abuse," Mem. Supp. Mot. Dismiss 8, the Board points to *Doe v. Bridgeforth*, 102 N.E.3d 710, 714, 724–25 (Ill. App. Ct. 2018), which found that the evidence presented at trial was insufficient to support the plaintiff's motion for a directed verdict on her claim of willful and wanton conduct because the evidence at trial showed "that no one at [the school] had any reason whatsoever to suspect that [the victim] was not safe with [the teacher]." *See* Mem. Supp. Mot. Dismiss 8 (citing *Bridgeforth*, 102 N.E.3d at 725).  G.C. rightly points out that the procedural posture of *Bridgeforth* diminishes its persuasive value as support for the Board's motion to dismiss.  *See* Resp. Mot. Dismiss 14–15.

not uniformly implemented, and knew that it was not conducting background checks on all employees." *Doe v. Bd. of Educ. of City of Chi.*, 611 F. Supp. 3d 516, 544–45 (N.D. Ill. 2020). Relatedly, the inherently dangerous nature of performing certain activities without adequate precautions or supervision may support plausible allegations of the reckless variety of willful and wanton conduct, even without evidence of prior harms specific to those defendants. *See Murray v. Chi. Youth Ctr.*, 864 N.E.2d 176, 195 (Ill. 2007) (mini-trampoline); *Hill v. Galesburg Cmty. Unit Sch. Dist. 205*, 805 N.E.2d 299, 305 (Ill. App. Ct. 2004) (chemistry experiment); *Hadley v. Witt Unit Sch. Dist. 66*, 462 N.E.2d 877, 881 (Ill. App. Ct. 1984) (hammering metal).

Here, G.C. points to *Ortega-Piron*, *Hill*, and *Hadley* to support her argument that she has sufficiently alleged that Defendants were "aware of specific and documented circumstances that would have put a reasonable person on notice of the danger and impending risk of serious harm to [G.C.] if [G.C.] was left unsupervised." Resp. Mot. Dismiss 12–13. Yet all three cases are distinguishable. G.C. does not allege that Defendants were on notice of her assailants' dangerous propensities as her assailants are still unknown. *See Ortega-Piron*, 820 N.E.2d at 423–24. And the Board points out that the activities which Hammer allegedly failed to supervise—walking and/or running outside—were not inherently dangerous. Mem. Supp. Mot. Dismiss 8–9; *see Hill*, 805 N.E.2d at 305; *Hadley*, 462 N.E.2d at 881. G.C. does not point the Court to any cases which establish that the peculiar sensitivities of the plaintiff, standing alone, may be enough to disclose a sufficiently serious risk that would make a defendant liable for willful and wanton conduct if ignored. *See Barr*, 89 N.E.3d at 320.

While G.C.'s allegations are sufficient to plausibly allege the duty necessary to maintain a mere negligence claim, they do not rise to the level of a "specific, foreseeable, and probable danger" that G.C. would be sexually assaulted if left unsupervised after injuring her ankle, as

required for a claim of willful and wanton conduct.  *See Choice*, 976 N.E.2d at 607.  The mere

fact that Hammer left a disabled and injured student unsupervised is insufficient to plausibly

allege that he disregarded a risk of sexual assault by unknown assailants that would have been

apparent to a reasonable person, let alone that Defendants themselves disregarded such a risk.

*See Jackson*, 549 N.E.2d at 833.  As currently pleaded, it is clear from the face of the First

Amended Complaint that G.C. has not plausibly alleged that Hammer leaving G.C. unsupervised

constituted willful and wanton conduct.  *See Love*, 363 F. Supp. 3d at 872 (N.D. Ill. 2019).  As

pleaded, the Board is entitled to immunity under section 3-108 from G.C.'s negligent supervision

claim.  The negligence claim is dismissed without prejudice.[6]

G.C. asks in the alternative for leave to amend her negligence claim.  Resp. Mot. Dismiss

29.  "Unless it is *certain* from the face of the complaint that any amendment would be futile or

otherwise unwarranted, the district court should grant leave to amend after granting a motion to

dismiss."  *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510,

519–20 (7th Cir. 2015) (quotation marks omitted).  Here, it is not certain that amendments to

G.C.'s negligence claim would be futile or unwarranted as she may be able to point to specific

aspects of her IEP, or some other set of facts, that sufficiently disclosed that she was at risk of

sexual assault if left unsupervised.  Therefore, G.C. is given leave to file an amended version of

her negligence claim.

## 2.  Title IX

Title IX provides in part that, "[n]o person . . . shall, on the basis of sex, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination under any

---

[6] Although the District has not formally appeared in this matter and did not move for this claim's dismissal, this analysis applies with equal force to the District and therefore the Court dismisses this claim without prejudice *sua sponte*.  *See, e.g.*, *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997) ("*Sua sponte* 12(b)(6) dismissals are permitted, provided that a sufficient basis for the court's action is evident from the plaintiff's pleading.").

education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a); *see also* First Am. Compl. ¶ 103 (alleging that Defendants "receive[] federal financial assistance for [their] education program[s]").  "Title IX is enforceable through an implied private right of action."  *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998)).  Under Title IX, "[a] plaintiff may allege a 'direct' or 'institutional' Title IX violation by pleading facts to show that the school itself discriminated against a person on the basis of their sex."  *Jauquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 807 (7th Cir. 2021).  "A plaintiff may also pursue a theory of 'indirect' discrimination by way of student-on-student harassment that is so severe that the harassment functionally excludes a student from school activities on the basis of sex."  *Id.* (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999)).  "[A] school may be held liable for the sexual harassment of one of its students 'when the harasser is a student.'"  *Johnson v. Ne. Sch. Corp.*, 972 F.3d 905, 911 (7th Cir. 2020) (quoting *Davis*, 526 U.S. at 643).  For such indirect claims, the Seventh Circuit has stated:

> Sexual harassment by a fellow student is actionable under Title IX if a plaintiff demonstrates: (1) the harassment was based on sex, (2) it was at an educational institution that was receiving federal funds, (3) the harassment was so severe, pervasive, and objectively offensive that it deprived the victim of access to educational opportunities, and (4) the school officials had actual knowledge of the harassment and were deliberately indifferent to it.

*Doe v. Columbia Coll. Chi. (Columbia Coll. II)*, 933 F.3d 849, 856 (7th Cir. 2019).

The Board first argues that G.C. has failed to allege that she was mistreated on the basis of sex.  Mem. Supp. Mot. Dismiss 9–11.  It asserts that G.C. fails to make "*any* factual allegation suggesting the [Defendants'] response to [G.C.]'s allegations were motivated by sex-based animus."  *Id.* at 10.  In its view, allegations that Defendants' Title IX investigation was imperfect are insufficient in the absence of allegations tying those imperfections to G.C.'s sex.  *See id.* at

18

10–11.  However, G.C. is not pursuing a direct Title IX claim against Defendants and is instead pursuing an indirect claim of deliberate indifference to her sex-based mistreatment.  *See, e.g.*, First Am. Compl. ¶ 107 ("[Defendants] failed to investigate A.C.'s report of sexual assault or take any meaningful corrective action as required by Title IX and [Defendants'] policies.").  The Board's citations are therefore inapposite.[7]

"'[A] recipient's deliberate indifference to one student's sexual harassment of another . . . constitute[s] intentional discrimination on the basis of sex' prohibited by Title IX."  *Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1098 (10th Cir. 2019) (second and third alteration in original) (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182 (2005)).  The Board's demand that G.C. allege that its investigatory actions were itself motivated by sex-based animus, *see* Mem. Supp. Mot. Dismiss 10, misses the distinction between direct and indirect claims, and is not a basis to dismiss G.C.'s Title IX claim that Defendants were deliberately indifferent to peer-on-peer harassment.

Next, the Board argues that G.C.'s allegations fail to plausibly allege that Defendants "had actual knowledge of the harassment."  *Id.* at 11–13 (quotation marks omitted).  It points to the absence of allegations "that the District knew or should have known [G.C.] would be sexually assaulted during physical education class and deliberately ignored that risk."  *Id.* at 12.

---

[7] For example, the Board characterizes this Court's decision in *O'Shea v. Augustana College*, 593 F. Supp. 3d 838, 850 (C.D. Ill. 2022), as finding that a student failed to state a Title IX claim because "the student failed to allege male victims would be treated differently."  Mem. Supp. Mot. Dismiss 11.  However, that portion of this Court's opinion was addressing a theory that the college "was deliberately indifferent to the actions of its employees" which may have been discriminatory—such as asking sexist, victim-blaming questions indicative of an anti-female bias— not a theory of deliberate indifference to reports of peer-on-peer harassment.  *See O'Shea*, 593 F. Supp. 3d at 849– 50.  When addressing the plaintiff's claim of deliberate-indifference to peer-on-peer harassment, this Court found that the plaintiff's allegations failed to state a claim because the alleged assaults occurred at a bar off-campus such that the college "did not exercise control over the context in which the assaults occurred," not because the alleged deliberate indifference was not on the basis of sex.  *See id.* at 847.  Similarly, *Doe v. Columbia College Chicago* (*Columbia College I*), 299 F. Supp. 3d 939, 955 (N.D. Ill. 2017), *aff'd*, 933 F.3d 849 (7th Cir. 2019), concerns an erroneous outcome claim, not a claim of deliberate indifference to peer-on-peer harassment.

Again, this argument does not get to the heart of G.C.'s claim—she does not premise liability upon Defendants' failure to prevent this sexual assault, but rather upon the insufficiency of their investigation and remedial actions after the assault. *See, e.g.*, First Am. Compl. ¶¶ 107–08 (alleging that Defendants' failed "to investigate A.C.'s report of sexual assault or take any meaningful corrective action as required by Title IX and the District's policies" and that such "failures were clearly unreasonable in light of the known circumstances"); *cf. Doe 12 v. Baylor Univ.*, 336 F. Supp. 3d 763, 775 (W.D. Tex. 2018) (distinguishing between "post-reporting claims" related to allegations that the defendant's "deliberately indifferent response to [the plaintiffs'] reports deprived them of educational opportunities and benefits provided by the school" and "heightened-risk claims" related to the defendant's "discriminatory practices in handling reports of sexual assault" which "constituted a policy of intentional discrimination that substantially increased [the p]laintiffs' risk of being sexually assaulted"). G.C. need not allege that Defendants stood idle in the face of risks that G.C. would be sexually assaulted that day in gym class to maintain a claim based upon the insufficiency of Defendants' responses.

Similarly, the Board argues that G.C. does not allege that Defendants' actions deprived her of educational opportunities because she does not allege that she "was subjected to or vulnerable to harassment or discrimination based on or related to sex or gender after providing notice to the District of the alleged assault." Mem. Supp. Mot. Dismiss 12–13. Instead, the Board argues, it offered to change her gym class and G.C. decided not to return to school. *Id.* at 13. G.C. responds that her decision to not return to the School does not undermine her claim, as she need not show that the inadequate investigation in fact caused her to suffer additional harassment—instead, showing that Defendants' actions increased her vulnerability to future harassment may be sufficient. Resp. Mot. Dismiss 24–26. A student's forced withdrawal from

an education program does not entitle an institution to a defense of "no further harm, therefore no foul"—increased vulnerability may be sufficient. *See Davis*, 526 U.S. at 644–45 (holding that a defendant may be liable if its deliberate indifference "make[s] [students] liable or vulnerable to" harassment (quotation marks omitted)); *Doe v. Galster*, 768 F.3d 611, 619–20 (7th Cir. 2014) (holding that a reasonable jury could find that the plaintiff was subjected to harassment that denied her equal access to education even though the plaintiff switched school districts); *accord Farmer*, 918 F.3d at 1104–05; *Joyce v. Wright State Univ.*, No. 3:17-cv-387, 2018 WL 3009105, at *9 (S.D. Ohio June 15, 2018).

Regarding the District's offer to swap out G.C.'s gym teacher, the Board characterizes this as an opportunity "to remove [G.C.] from her alleged, unidentified harasser," Mem. Supp. Mot. Dismiss 12, but the First Amended Complaint characterizes this offer as motivated by ensuring that G.C. "had a female instructor with her," not protecting her from her assailants, *see* First Am. Compl. ¶ 50.

To the extent Defendants are arguing that, as pleaded, their investigation and remedial efforts were not clearly unreasonable, the Court disagrees. "Deliberate indifference is a high bar because [s]chool administrators must continue to enjoy the flexibility they require in disciplinary decisions unless their response to harassment is clearly unreasonable." *Columbia Coll. II*, 933 F.3d at 857 (alteration in original) (quotation marks omitted). This high bar avoids a standard which would ensure that defendants could "avoid liability only by purging their schools of actionable peer harassment," and does not allow victims "to make particular remedial demands." *Davis*, 526 U.S. at 648; *see also Gabrielle M. v. Park Forest-Chi. Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 825 (7th Cir. 2003) ("*Davis* disapproved of a standard that would force funding recipients to suspend or expel every student accused of misconduct.").

Allegations of a merely negligent investigation are insufficient to allege deliberate indifference.  *See Johnson*, 972 F.3d at 912 ("A negligent response is not unreasonable, and therefore will not subject a school to liability.").  For example, when a student-victim was repeatedly harassed on a bus by other student-perpetrators, *Sch. Dist. U-46*, 557 F. Supp. 3d at 869, the school's principal promptly viewed video recordings of the incidents, spoke with the student-perpetrators and their parents, removed the student-perpetrators from the bus, took steps to keep them away from the student-victim, observed the student-victim in class for several days, and provided the student-victim with two weeks of counseling from the school's social worker, *id.* at 874–75.  Although one of the student-perpetrators subsequently harassed the student victim again a few weeks later, *id.* at 870, the court found that the school's response was not clearly unreasonable, *id.* at 875.  In another case, a college issued a no-contact order, interviewed seven students identified by the victim and perpetrator as witnesses, and concluded about two weeks later that there was not a preponderance of the evidence against the perpetrator, finding him "guilty but not guilty."  *Pogorzelska v. VanderCook Coll. of Music*, 442 F. Supp. 3d 1054, 1063 (N.D. Ill. 2020).  The court would have found that investigation was not clearly unreasonable, but the college subsequently failed to enforce its own no-contact order, such that the plaintiff alleged a plausible claim that the college's investigation and response were "clearly unreasonable under the known circumstances."  *Id.* at 1063–64.

Further, where freshmen on the football team were allegedly sexually assaulted as part of a hazing ritual, the school highlighted that it took immediate action after learning of the attacks, notified school administrators, contacted parents, held a meeting the next morning, and suspended four student-perpetrators.  *Doe A v. Plainfield Cmty. Consol. Sch. Dist. 202*, No. 21 C 4460, 2023 WL 2428870, at *7 (N.D. Ill. Mar. 9, 2023).  The plaintiffs responded by

emphasizing that the football coaches only spoke to the student-victims and not other players, the defendants did not conduct any type of Title IX investigation and solely referred the matter to the police, and the defendants failed to provide information about the plaintiffs' rights under Title IX and resources available to sexual-assault victims. *Id.* Noting that "just because the school made *some* effort does not necessarily preclude a finding of deliberate indifference," the court found that the plaintiffs plausibly alleged deliberate indifference to their reports of sexual assault. *Id.* at *8; *see also Doe 12*, 336 F. Supp. 3d at 776 (finding that the plaintiffs adequately alleged deliberate indifference where the university "discouraged them from reporting their assaults," "misled and lied to [them] about their options for reporting and accommodations," and "obstructed [their] access to medical and mental health treatment").

Here, G.C. alleges that Defendants prejudged the investigation as A.C. was told that the assault "couldn't have happened," Andedo blamed G.C. for being unable "to tell people no," Defendants declined to notify the police, and the extent of Andedo's investigation was to speak to a few students and Hammer the day that A.C. reported the assault. First Am. Compl. ¶¶ 42–46. Andedo stated that "something happened" to G.C. but downplayed it as just a "minor error." *Id.* ¶¶ 49–50. The only remediation offered was to change G.C.'s gym teacher and to give her some at-home counseling services. *Id.* Only after A.C. took it upon herself to report the incident to the police did Defendants report an incident of failed supervision to the Illinois Department of Children and Family Services. *Id.* ¶¶ 52–53, 55–56. Defendants did not follow their Title IX and IEP policies and did not provide A.C. with information on those policies. *Id.* ¶ 64. Together, these allegations portray a prejudged, rushed, and insufficient investigation and remediation which: (1) deviated from established procedures; (2) belatedly involved outside authorities but only after prompting from A.C.'s independent actions; (3) failed to identify

23

G.C.'s assailants; and (4) provided accommodations which were inadequate to keep G.C. away from those unknown assailants.  Taking these allegations as true and viewing them in the light most favorable to G.C., the Court finds that G.C. has plausibly alleged that Defendants' response was clearly unreasonable under the known circumstances and that Defendants were therefore deliberately indifferent to the report of G.C.'s assault.  *See Doe A*, 2023 WL 2428870, at *8; *Pogorzelska*, 442 F. Supp. 3d at 1063–64; *Doe 12*, 336 F. Supp. 3d at 776.[8]

### 3.  ADA and Rehabilitation Act

Turning to G.C.'s disability-based claims, the Board reads the First Amended Complaint to assert a variety of legal theories, namely peer-to-peer harassment, intentional discrimination, and failure to accommodate.  Mem. Supp. Mot. Dismiss 13–15.  G.C. clarifies that she is only pursuing a theory of intentional discrimination.  Resp. Mot. Dismiss 27 (citing First Am. Compl. ¶ 139).  The parties assert that the analysis of G.C.'s ADA and Rehabilitation Act claims is identical given the statutes' similarities.  *Id.* at 26–27; Mem. Supp. Mot. Dismiss 13.  The Court's analysis accordingly does not distinguish between the ADA and Rehabilitation Act.  *See, e.g.*, *A.H. ex rel. Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018) ("The

---

[8] When responding to G.C.'s disability-based claims, the Board asserts that G.C. "cannot establish deliberate indifference where it is undisputed that the District conducted an investigation and instituted supportive measures even where [G.C.]'s allegations were not substantiated."  Mem. Supp. Mot. Dismiss 14 (citing *I. L. v. Hous. Indep. Sch. Dist.*, 776 F. App'x 839, 843 (5th Cir. 2019)).  Simply conducting some sort of investigation and offering supportive measures despite that investigation failing to identify a perpetrator or evidence of wrongdoing may not be sufficient to avoid liability under Title IX—the reasonableness of an investigation depends upon the known circumstances.  *See, e.g.*, *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1263 (11th Cir. 2010) ("The Title IX inquiry is contextual: it does not require school districts to simply do something in response to sexual harassment; rather, they must respond in a manner that is not clearly unreasonable in light of the known circumstances." (quotation marks and emphasis omitted)).  Moreover, the Board's citation to *I. L.* is distinguishable.  In affirming the grant of summary judgment on the plaintiff's claim of deliberate indifference, the Fifth Circuit emphasized that the defendants' remedial measures "were almost entirely successful in eliminating *any* contact between the students and prevented future sexual contact or harassment."  *I. L.*, 776 F. App'x at 843.  Here Defendants failed to identify the perpetrators and future sexual contact or harassment was prevented only by G.C.'s withdrawal from the School, not Defendants' investigation or remediation.  *I. L.* does not support the Board's position.

relevant provisions and implementing regulations of the Rehabilitation Act and the ADA are materially identical." (quotation marks omitted)).

To make out a claim of intentional discrimination under either statute, G.C. must plausibly allege that she was: (1) a qualified person; (2) with a disability; and (3) Defendants denied her access to a program or activity because of her disability.  *See Stanek*, 783 F.3d at 641; *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012); *cf. Bostock v. Clayton County*, 590 U.S. 644, 658 (2020) (holding that prohibited discrimination occurs when a defendant "intentionally treats a person worse because of " a protected characteristic).  The Board does not challenge the sufficiency of G.C.'s allegations that she was qualified to attend the School nor her allegations that she was disabled.  *See* Mem. Supp. Mot. Dismiss 13–15; First Am. Compl. ¶¶ 29, 143.  The Board instead relies upon non-binding authorities to assert that G.C. must show that Defendants "refused to provide reasonable accommodations for the handicapped plaintiff," to maintain a claim of intentional discrimination.  *See* Mem. Supp. Mot. Dismiss 14 (quoting *D.A. ex rel. Latasha A. v. Hous. Indep. Sch. Dist.*, 629 F.3d 450, 454 (5th Cir. 2010)).  The Board's citation is inapposite as G.C. is not pursuing a failure-to-accommodate theory.  *See* Resp. Mot. Dismiss 27.

When arguing that G.C. has failed to plausibly allege "a theory of disability-based intentional discrimination," the Board argues that she "has failed to allege what benefits she sought that were requested and denied based on disability."  Mem. Supp. Mot. Dismiss 14.  The Board posits that the IEP addressed G.C.'s mental and physical disabilities which existed prior to her sexual assault and then asserts that G.C. does not allege that Defendants "had knowledge of an ankle injury that qualified [G.C.] as an individual with a disability such that [G.C.] required accommodation for the ankle injury." *Id.* at 14–15.  Slipping back into a failure-to-accommodate

theory, the Board argues that G.C.'s "alleged isolation based on an ankle injury is not a failure to accommodate." *Id.* at 15. Again, G.C. is not pursuing a failure-to-accommodate theory. *See* Resp. Mot. Dismiss 27. The benefits which she sought that were denied on the basis of her disabilities are "the right to participate in school activities" and "educational opportunities." *Id.*; *see also* First Am. Compl. ¶ 124 ("Section 504 guarantees G.C. the right to participate, along with nondisabled students, in academic, nonacademic and extracurricular activities . . . and services to the maximum extent appropriate to her needs."). Specifically, she notes that the disparate treatment she suffered "prevented her from attending public school." Resp. Mot. Dismiss 29. The Board's assertion that G.C. has failed to identify the benefits which she was denied is incorrect.

Alleging a plausible claim of disability discrimination does not require much of a plaintiff. *See Jaros*, 684 F.3d at 672 ("Plausibility is not an exacting standard . . . ."). G.C. alleges that those charged with investigating her report of sexual assault blamed her disability as a contributing cause to her assault. *See* First Am. Compl. ¶ 43 ("Andedo stated G.C. received social skills classes so she 'just probably needed social skills classes to learn what "no spots" are and how to tell people no.'"). Defendants were obligated to engage G.C.'s IEP team about her report yet failed to do so. *Id.* ¶ 64. She further alleges that Defendants' Title IX policies were followed in five or six other cases of reported sexual assault which did not involve a disabled victim, yet those policies were not followed for her report. *Id.* ¶¶ 65–66. Together, these facts plausibly allege that G.C. was intentionally subjected to worse treatment—in the form of a comparatively shabby investigation of her report of sexual assault—because of her disabilities and that such differential treatment denied her of educational opportunities. *See, e.g.*, *Doe v. McHenry Cnty. Coll.*, No. 17 cv 4247, 2020 WL 5209834, at *1, 4 (N.D. Ill. Sept. 1, 2020)

(finding sufficient allegation of intentional discrimination under the ADA where an autistic student alleged that she did not realize that her physical contact with other students was nonconsensual and that the defendants "rejected her request to be interviewed by a professional with experience with autism" and upheld sanctions which were imposed against her).  At this stage of the case and taking those allegations as true, G.C. has plausibly alleged that Defendants intentionally discriminated against her on the basis of her disabilities.  *See Stanek*, 783 F.3d at 641; *Jaros*, 684 F.3d at 672.

## CONCLUSION

Accordingly, Defendant Rock Island Board of Education's Motion to Dismiss Plaintiff's Amended Complaint, ECF No. 8, is GRANTED IN PART and DENIED IN PART.  Plaintiff G.C.'s claim of negligence is DISMISSED WITHOUT PREJUDICE, and she is granted leave to file an amended complaint by October 18, 2024.


Entered this 27th day of September, 2024.

s/ Sara Darrow
_____
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE
